UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,

               Plaintiff,

v.

FRACTEL LLC, *et al.*,

Case No.  26-cv-10464

Honorable Brandy R. McMillion
United States District Judge

Honorable Elizabeth A. Stafford
United States Magistrate Judge

_____

**PLAINTIFF'S EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION
AGAINST DEFENDANT FRACTEL LLC**

_____

Plaintiff Mark W. Dobronski, appearing in propria persona, moves for entry of

a Temporary Restraining Order and Preliminary Injunction against Defendant FracTel

LLC pursuant to Fed. R. Civ. P. 65, E.D. Mich. LR 65.1, and the Court's inherent

equitable authority.  This motion is based on the pleadings, the accompanying brief,

the Declaration of Mark W. Dobronski (Exhibit 1), and the exhibits attached thereto.

Emergency relief is necessary because the unlawful prerecorded robocall

campaign has not abated. To the contrary, despite repeated call-specific notice, audio

recordings, callback verification, FCC complaints, and formal service of the summons

and  complaint,  the  campaign  continued.  FracTel's  own  email  communications

1

confirm that FracTel independently called one of the reported numbers and "received the same greeting from Ava," contacted a reseller to investigate the calls to and from the end user, and stated that it would cancel the implicated numbers while the abuse was being investigated. *See* Ex. 3.

FracTel's emails further show that FracTel had reseller-facing investigative channels, acknowledged efforts to remove or cancel numbers used by resellers doing business with Consumer Transparency Group, and later reported that a reseller had Plaintiff's number blocked because of the complaint, while also attributing continued calls to spoofing by a third party. *See* Exs. 6, 7. These communications materially corroborate Plaintiff's callback evidence, undermine the simple-spoofing defense, show actual notice, show capacity to investigate and mitigate through reseller and downstream account relationships, and demonstrate that FracTel's chosen "mitigation" has at times targeted Plaintiff rather than the source.

The campaign remains active. On Saturday, May 30, 2026, Plaintiff received seven additional calls that appeared to originate from FracTel-associated numbers. On June 1, 2026, Plaintiff received an additional apparent FracTel-number call at 4:19 p.m. and another at 4:34 p.m. Earlier that same day, at approximately 1:30 p.m., Plaintiff participated in a telephone conference with FracTel's counsel, Robert Horwitz, and FracTel's President, Michael Crown, regarding the motion to dismiss

FracTel intended to file on June 2, 2026. During that conference, Horwitz and Crown maintained that none of the calls traversed the FracTel network. They further asserted that Plaintiff had already been provided the names of the three purported reseller entities involved and that Plaintiff's remedy was to subpoena those resellers. Plaintiff explained that discovery has not yet opened in this action and that FracTel's anticipated filing of a motion to dismiss would only further delay the opening of discovery and Plaintiff's ability to obtain compulsory process. Horwitz further maintained that Plaintiff's callback evidence was irrelevant because the TCPA addresses outbound telemarketing calls, not Plaintiff's own return calls. Yet later the same day, Plaintiff received another apparent FracTel-associated call. These events underscore both the immediacy of the harm and the inadequacy of informal efforts.

Accordingly, Plaintiff requests entry of a Temporary Restraining Order and Preliminary Injunction requiring FracTel to preserve evidence, disclose reseller and downstream account information under appropriate confidentiality protections, conduct traceback and mitigation, refrain from continuing to furnish telecommunications resources to the campaign, refrain from blocking or suppressing Plaintiff's number as a substitute for stopping the source, and certify under oath the steps it has taken.

The undersigned plaintiff certifies that on June 1, 2026 he personally spoke to,

or met with, opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel expressly denied concurrence.

Respectfully submitted,

Dated: June 1, 2026

_____

Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
Telephone: (734) 641-2300
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,                    Case No.  26-cv-10464

          Plaintiff,               Honorable Brandy R. McMillion
                                     United States District Judge

v.
                                     Honorable Elizabeth A. Stafford
FRACTEL LLC, *et al.*,                United States Magistrate Judge

_____

**BRIEF IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION
OR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION
<u>AGAINST DEFENDANT FRACTEL LLC</u>**

5

## CONCISE STATEMENT OF ISSUES PRESENTED

1.   Whether Plaintiff has shown a substantial likelihood of success where FracTel's own emails corroborate Plaintiff's callback testing, confirm reseller and end-user investigative channels, show repeated notice, and show that the campaign continued notwithstanding FracTel's knowledge and claimed mitigation efforts.

> Plaintiff says: Yes
> The Court should rule: Yes

2.   Whether Plaintiff has shown irreparable harm where the unlawful robocalls continue, informal measures have failed, and FracTel's own chosen "mitigation" has included blocking or suppressing Plaintiff's number rather than stopping the source.

> Plaintiff says: Yes
> The Court should rule: Yes

3.   Whether the balance of equities and public interest favor narrowly tailored emergency relief requiring preservation, traceback, identification, mitigation, and cessation of consumer-side blocking.

> Plaintiff says: Yes
> The Court should rule: Yes

## MOST SIGNIFICANT OR RELEVANT AUTHORITIES

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007)

*De la Cabada v. Ytel, Inc.*, No. 19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. Mar. 10, 2020)

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)

*Linlor v. Five9, Inc.*, No. 17-cv-218-MMA (BLM), 2017 WL 2972447 (S.D. Cal. July 12, 2017)

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002)

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)


Fed. R. Civ. P. 65

**INTRODUCTION**

This motion is no longer supported merely by Plaintiff's own logs and recordings. It is now supported by FracTel's own words.

The attached email threads show that, by late January 2026, FracTel was not merely receiving complaints in the abstract. FracTel acknowledged that callback confirmation from a different telephone number could support opening an abuse case for the reseller to investigate the end user and the calling. *See* Ex. 2. The very next day, FracTel confirmed that it saw Plaintiff's two callbacks, that its own representative called the reported number and "received the same greeting from Ava," that FracTel was contacting the reseller to investigate calls to and from the end user, and that FracTel would cancel the implicated numbers while the abuse was being investigated. *See* Ex. 3.

Yet the calls did not stop. By mid-February, FracTel was saying that it had worked hard to remove or cancel all numbers from any reseller doing business with Consumer Transparency Group and that all resellers from the earlier matters should already have had Plaintiff's number on their blocked list. *See* Ex. 6. Plaintiff immediately objected that blocking Plaintiff's number was neither lawful nor adequate mitigation because it did nothing to stop the originating caller, instead shielded the source, and interfered with Plaintiff's legitimate communications. *Id.* On

February 20, 2026, FracTel responded that it could not release customer information without court-ordered subpoena and relayed that a reseller claimed Plaintiff's number remained blocked due to the Consumer Transparency Group complaint while attributing continuing calls to spoofing by a third party. *See* Ex. 7.

These emails transform the equities. They corroborate Plaintiff's callback-loop evidence, undermine a simplistic spoofing defense, show actual notice, show reseller and downstream investigative channels, show FracTel's capacity to mitigate, and show that informal efforts failed. Emergency judicial intervention is warranted.

## FACTUAL BACKGROUND

Plaintiff has alleged and documented an evolving prerecorded telemarketing campaign that has morphed through different recorded personas and scripts while retaining the same basic architecture: rotating caller-identification numbers, generic or misleading caller-identification name information, prerecorded or artificial-voice solicitations, and callback routing into the same or substantially similar debt-relief or scam telemarketing system.

The newly attached email threads materially strengthen that showing.

On January 29, 2026, FracTel Technical Support representative Rob Lilja wrote that if Plaintiff had called the reported number back from a different phone number and got the same message, FracTel could use that as the basis for opening an

9

abuse case for the reseller to investigate the end user and the calling. *See* Ex. 2.

On January 30, 2026, Lilja went further. He stated that FracTel saw Plaintiff's two callbacks about a minute apart, that he himself had called the number and "received the same greeting from Ava," that he was contacting the reseller that the phone numbers were issued to and asking it to investigate the calls to and from the end user, and that FracTel would cancel the numbers in the meantime while the abuse was being investigated. *See* Ex. 3.

On February 4, 2026, FracTel stated it was "actively disconnecting" the numbers as Plaintiff reported them. *See* Ex. 4. On February 5, 2026, however, FracTel shifted position and directed Plaintiff to pursue traceback through Plaintiff's own terminating provider and the Industry Traceback Group, stating that only the carrier that terminated the call to the end user could start the traceback process. *See* Ex. 5.

By February 16, 2026, the calls had plainly not stopped. FracTel wrote that it was disappointed Plaintiff was receiving calls from its numbers again, said it had worked hard to get all numbers removed or cancelled from any reseller doing business with Consumer Transparency Group, and stated that all resellers from the prior cases should already have had Plaintiff's number on their blocked list. *See* Ex. 6.

Plaintiff immediately responded that blocking Plaintiff's number was not

lawful or adequate mitigation because it did nothing to stop the originating caller, instead shielded the source of the traffic while allowing the scam operation to continue targeting other consumers, and interfered with Plaintiff's legitimate communications. Plaintiff demanded the identity of the originating customer and intermediary reseller(s), the dates and times the traffic was carried, all mitigation measures taken, confirmation whether traceback procedures had been initiated, and preservation of call-detail, contractual, onboarding, KYC, and internal communications records. *See* Ex. 6.

On February 20, 2026, FracTel responded that it could not release any customer information and that such information needed to be obtained by court-ordered subpoena. FracTel further reported that the reseller said Plaintiff's 407 number was still blocked from being called on their network due to the Consumer Transparency Group complaint, while also claiming the calls were spoofed by a third party. *See* Ex. 7.

The campaign nevertheless continued. As set forth in Plaintiff's Declaration, Ex. 1, on Saturday, May 30, 2026, Plaintiff received seven additional calls that appeared to originate from FracTel-associated numbers. *See* Ex. 1, Dobronski Decl. ¶ 10. On June 1, 2026, Plaintiff received another apparent FracTel-associated call at 4:19 p.m, and another at 4:34 p.m. *See* Ex. 1, Dobronski Decl. ¶ 16. That same day,

11

at approximately 1:30 p.m., Plaintiff participated in a telephone conference with FracTel's counsel, Robert Horwitz, and FracTel's President, Michael Crown, concerning FracTel's anticipated motion to dismiss. *See* Ex. 1, Dobronski Decl. ¶ 11. During that conference, Horwitz and Crown maintained, in substance, that none of the calls at issue traversed the FracTel network. *See* Ex. 1, Dobronski Decl. ¶ 12. They further maintained, in substance, that Plaintiff had already been provided the names of the three reseller entities allegedly involved and that Plaintiff's remedy was to subpoena those resellers. *See* Ex. 1, Dobronski Decl. ¶ 13. Plaintiff explained that discovery has not yet opened in this action and that the filing of a motion to dismiss would only delay the opening of discovery and Plaintiff's ability to obtain subpoenas and compulsory process. *See* Ex. 1, Dobronski Decl. ¶ 14. Horwitz further maintained, in substance, that Plaintiff's callback evidence was irrelevant because the TCPA addresses outbound telemarketing calls, not Plaintiff's own return calls. *See* Ex. 1, Dobronski Decl. ¶ 15. Yet later that same day, Plaintiff received another two apparent FracTel-associated calls. *See* Ex. 1, Dobronski Decl. ¶ 17.

These additional facts further underscore the need for immediate judicial intervention. Plaintiff does not contend that his return calls themselves are TCPA violations. *See* Ex. 1, Dobronski Decl. ¶ 17.Rather, the callback evidence is probative because it tends to show that the displayed caller-identification numbers were

functionally connected to the same scam operation, thereby undermining the notion that the numbers were merely random spoofed numbers belonging to unrelated innocent third parties. *Id.*

Thus, by FracTel's own admissions, FracTel had access to reseller-facing and end-user investigative channels, independently confirmed the same Ava callback greeting, represented that it could and would cancel numbers, later acknowledged efforts to remove or cancel numbers used by resellers, and yet still failed to stop the campaign. *See* Exs. 3, 6.

## LEGAL STANDARD

A temporary restraining order and preliminary injunction are governed by the familiar four-factor test: (1) likelihood of success on the merits, (2) irreparable harm absent relief, (3) whether the balance of equities favors the movant, and (4) whether the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). These factors are interrelated considerations that must be balanced together. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). A district court has broad equitable authority to tailor interim relief to prevent ongoing harm and preserve the status quo pending fuller proceedings. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

## ARGUMENT

## I.   PLAINTIFF HAS SHOWN A STRONG LIKELIHOOD OF SUCCESS

FracTel's own emails materially strengthen Plaintiff's merits showing.

FracTel did not merely receive complaints and do nothing. FracTel acknowledged that callback confirmation from a different phone number could support an abuse case for the reseller to investigate the end user and the calling. *See* Ex. 2. FracTel then independently confirmed the same "Ava" greeting, contacted the reseller, and stated that it would cancel the implicated numbers while the abuse was being investigated. *See* Ex. 3.

Those admissions matter for two separate reasons.

First, they independently corroborate Plaintiff's callback-loop evidence. FracTel's own representative personally called a reported number and reached the same greeting from Ava. That substantially undercuts any contention that Plaintiff's callback evidence merely reflected random spoofing of unrelated innocent third-party numbers. *See* Ex. 3.

Second, they demonstrate that FracTel had concrete reseller-facing and end-user investigative channels. FracTel expressly referenced contacting a reseller, asking it to investigate calls to and from the end user, opening abuse tickets, and cancelling numbers. *See* Exs. 2, 3. Those are not the statements of an entity powerless to trace

or mitigate. They are the statements of an entity acknowledging access to downstream account structure and remedial channels.

FracTel's later positions only strengthen the need for relief. FracTel first emphasized spoofing and no outbound use, then confirmed the same Ava greeting and reseller investigation, then said it was actively disconnecting numbers, then redirected traceback responsibility outward, then said resellers should already have had Plaintiff's number on blocked lists, and finally relayed reseller claims that Plaintiff's number remained blocked while the calls were still being blamed on spoofing. *See* Exs. 3, 4, 5, 6, 7.

That sequence supports Plaintiff's theory of actual notice, shifting explanations, post-notice facilitation, and failure to meaningfully mitigate. It also supports Plaintiff's theory that FracTel cannot avoid responsibility by playing ostrich once it had concrete reason to know unlawful traffic was traversing FracTel-associated resources. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (willful blindness exists where a party suspects a high probability of wrongdoing and deliberately avoids confirming it). And carrier status does not automatically preclude TCPA-related liability where there is a high degree of involvement or actual notice plus failure to act. *See Linlor v. Five9, Inc.*, No. 17-cv-218-MMA (BLM), 2017 WL 2972447 at *4 (S.D. Cal. July 12, 2017); *De la*

15

*Cabada v. Ytel, Inc.*, No. 19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. Mar. 10, 2020).

At minimum, Plaintiff has shown a substantial likelihood of success on the theory that FracTel had actual notice of unlawful prerecorded traffic traversing FracTel-associated resources, had reseller-facing and downstream investigative channels, independently corroborated Plaintiff's callback evidence, and nevertheless failed to stop the campaign.

## II.    PLAINTIFF IS SUFFERING IRREPARABLE HARM

The calls continue. Informal efforts have failed. FracTel's own communications show why judicial relief is necessary.

By February 16, 2026, FracTel was representing that resellers involved in the earlier matters should already have had Plaintiff's number on a blocked list. *See* Ex. 6. By February 20, 2026, FracTel reported that a reseller said Plaintiff's 407 number was still blocked due to the Consumer Transparency Group complaint. *See* Ex. 7. That is not lawful or adequate mitigation. As Plaintiff explained in real time, blocking Plaintiff's number does nothing to stop the originating caller, instead shields the source while allowing the scam operation to continue targeting others, and interferes with Plaintiff's legitimate communications. *See* Ex. 6.

This is precisely the kind of ongoing harm for which legal remedies are

inadequate. The injury is not limited to a backward-looking claim for statutory damages. It includes continuing unwanted robocalls, continued facilitation of scam traffic, and interference with Plaintiff's own communications through consumer-side blocking or suppression. The seven additional apparent FracTel-associated calls received on May 30, 2026, and the additional apparent FracTel-associated call received on June 1, 2026, confirm that the harm remains live and immediate. *See* Ex. 1, Dobronski Decl. ¶ 18.

Informal complaints have failed. Voluntary carrier action has failed. Even direct discussion with FracTel's counsel and president on June 1, 2026 did not stop another apparent FracTel-associated call later that same day. Court intervention is required.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR RELIEF

The balance of equities and public interest strongly favor relief. FracTel's own emails show that it has reseller-facing investigative capabilities and can contact resellers, investigate end users, and cancel numbers while abuse is under investigation. *See* Ex. 3. The requested order therefore does not ask FracTel to do the impossible; it asks FracTel to do, under judicial supervision, what FracTel has already represented it can do.

Enjoining continued facilitation of a scam-apparent prerecorded telemarketing

campaign, requiring preservation and traceback, and prohibiting consumer-side "mitigation" that blocks the victim rather than the source serve both the public interest and the integrity of the telecommunications system. *See* Exs. 6, 7.

FracTel's current position—that Plaintiff's remedy is merely to subpoena the resellers—further underscores the need for immediate equitable relief. Discovery has not yet opened, FracTel intends to file a motion to dismiss that will delay ordinary discovery, and the relevant reseller, routing, traceback, and downstream-account information remains within FracTel's present knowledge and control.

## IV.    THE REQUESTED RELIEF IS NARROWLY TAILORED

Plaintiff does not seek a sweeping order untethered to the facts. The requested relief is narrowly tailored to stop the ongoing campaign, preserve evidence, identify the responsible reseller and downstream accounts, require traceback and mitigation, and prevent FracTel from substituting consumer-side blocking for source-side intervention.

Plaintiff respectfully requests that the Court order FracTel to:

1.    Preserve all call-detail, SIP, STIR/SHAKEN, CNAM, traceback, customer, reseller, subscriber, onboarding, KYC, internal communications, and related records concerning the reported robocall campaign;

2.   Identify, under seal or attorneys'-eyes-only if necessary, each reseller, downstream customer, and end-user account previously contacted or investigated by FracTel in connection with Plaintiff's reports of the Ava / Consumer Transparency Group / successor prerecorded campaigns;

3.   Disclose what numbers FracTel cancelled, when it cancelled them, what abuse tickets were opened, and what results were obtained from reseller or end-user investigation;

4.   Conduct and document traceback and mitigation for each implicated FracTel-associated number and related account;

5.   Refrain from continuing to furnish telecommunications resources used in the campaign;

6.   Refrain from blocking, suppressing, or otherwise impairing Plaintiff's number as a substitute for investigating, tracing, suspending, or terminating the originating or responsible account(s);

7.   Identify whether its claimed mitigation consisted in whole or in part of blocking or suppressing Plaintiff's number, and if so to cease that practice immediately; and

8.   File a sworn certification describing the steps taken to comply.

## V. NOMINAL BOND

Plaintiff requests that bond be set at $1.00, or such nominal amount as the Court deems appropriate, because the requested relief is directed primarily toward preservation, traceback, disclosure under protective conditions, cessation of ongoing unlawful facilitation, and prevention of consumer-side blocking in lieu of genuine mitigation.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter a Temporary Restraining Order and Preliminary Injunction against Defendant FracTel LLC, grant the relief requested above, set a prompt hearing on preliminary injunctive relief, and award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: June 1, 2026

_____

Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
Telephone: (734) 641-2300
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

**CERTIFICATE OF SERVICE**

I certify that on June 1, 2026, I electronically filed the foregoing *Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction against Defendant FracTel LLC* with the Clerk of the Court via the Court's CM/ECF filing system, which will send notification of such filing to all counsel of record.

_____

Mark W. Dobronski